IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ADMIRAL INDEMNITY COMPANY and CLERMONT SPECIALTY MANAGERS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 16 C 5085 |
| 899 PLYMOUTH COURT CONDOMINIUM ASSOCIATION D&K REAL ESTATE SERVICE CORP.; BURTON GILBERG; JAN GILBERG; BALA GHIMIRE; and ANNAPURNA, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

There are two pending lawsuits against defendants 899 Plymouth Court Condominium Association and D&K Real Estate Service Corporation (collectively, Plymouth), alleging that Plymouth is liable for water damage suffered by a commercial condominium unit in its building. Plymouth is being defended in both lawsuits by its liability insurer, plaintiffs Admiral Indemnity Company and its claim manager Clermont Specialty Managers (collectively, Admiral). Admiral agreed to defend Plymouth under a reservation of rights. After conducting an investigation, Admiral concluded that the insurance policy that it issued does not cover the claims asserted against Plymouth. Admiral filed this lawsuit seeking a declaratory judgment that it has no duty to defend or indemnify Plymouth as well as reimbursement for expenses that Admiral has paid defending Plymouth. Both sides have moved for summary judgment.

## Background

Plymouth purchased a general commercial liability insurance policy from Admiral for periods covering November 1, 2010 through November 1, 2013. Plymouth's policy included coverage for "bodily injury and property damage liability" (Coverage A) and "personal and advertising injury liability" (Coverage B). Defs.' Ex. A-2 (Plymouth Policy), §§ A, B. Coverage A provides coverage for bodily injury and property damage only if the injury or damage is (1) caused by an "occurrence" (2) during the policy period. *Id.* § A, ¶ 1(b)(1)-(3). Coverage B provides that Admiral will cover any personal injury arising from "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." *Id.* § 5, ¶ 14(c). Relevant sections of the policy are quoted below:

> **SECTION I – COVERAGES**
> **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1.   Insuring Agreement**
> **a.**   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages . . . .
>
> * * *
>
> **b.**   This insurance applies to "bodily injury" and "property damage" only if:
> **(1)**   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
> **(2)**   The "bodily injury" or "property damage" occurs during the policy period; and
> **(3)**   Prior to the policy period, no insured listed under Paragraph **1**. of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period,

that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

\* \* \*

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1**. of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:
**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to use or any other insurer;
**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or
**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

\* \* \*

**2. Exclusions**
This insurance does not apply to:
**a. Expected Or Intended Injury**
"Bodily injury" or "property damage" expected or intended from the standpoint of the insured . . . .

\* \* \*

**j. Damage to Property**
"Property damage" to:
**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

\* \* \*

**(4)** Personal property in the care, custody or control of the insured;
**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
**(6)** That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.  Insuring Agreement**
**a**.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages . . . .
**b.**  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

* * *

**SECTION V – DEFINITIONS**

**13.**  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
**14.**  "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

* * *

**c.**  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

* * *

**17.**  "Property damage" means:
**a.**  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
**b.**  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Plymouth Policy §§ 1, 5.

While insured by Admiral, Plymouth was sued in two separate lawsuits for damages resulting from water leaks from the building's community pool into Unit G-02, a commercial condominium unit that houses a restaurant.  In 2014, the owner of Unit G-

4

02, Jan Gilberg, and her husband Burton Gilberg (collectively, Gilberg) filed a six-count lawsuit against Plymouth. The court in that case dismissed counts 1, 2, and 4, leaving counts 3 (breach of fiduciary duty), 5 (abatement of private nuisance), and 6 (breach of covenant). Defs.' Ex. C (Gilberg Fourth Am. Compl.). Counts 3 and 6 are premised on alleged violations of the Illinois Condominium Property Act and the condominium declaration and bylaws. Gilberg alleges that she made Plymouth aware of the leaks as early as 2012. *Id.* ¶ 31. She also alleges that she attended Plymouth's board meetings and gave reports on the pool leaks and the damage they were causing. *Id.* ¶ 34. Sometime in October 2013, the City of Chicago cited Plymouth for a building code violation and directed it to "repair all of the leaks . . . from [the] swimming pool." *Id.* ¶ 39. In November 2013, Plymouth's engineers prepared a report stating that "the underlying waterproofing membrane [for the pool] is in poor condition" and recommending that Plymouth install a "waterproofing coating at the Pool Mezzanine floor to minimize water infiltration through the floor into the commercial spaces below." *Id.* ¶¶ 46, 48. Sometime in June 2014, Plymouth made repairs to the pool area, but Gilberg alleges that the repairs did not prevent further leaks. *Id.* ¶¶ 54-59. Gilberg contends that because of the "purported 'remedies' that [Plymouth] performed and/or caused to be performed," the retail and rental value of Unit G-02 decreased, making the unit "substantially unmarketable." *Id.* ¶¶ 60, 62. In count 5, a claim alleging nuisance, Gilberg contends that the "leaking caused by the [ ] Building's pool area substantially and unreasonably interferes with and invades upon [Gilberg's] right to quiet enjoyment" to her property. *Id.* ¶ 78. Gilberg alleges that Plymouth "intentionally and/or negligently failed to act regarding the leaks . . . after receiving notice of the leaks" and "fail[ed] to

5

adequately repair and/or maintain these areas . . . ." *Id.* ¶¶ 82, 83.

Shortly after Gilberg filed her lawsuit, her tenants Bala Ghimire and Annapurna Inc. (collectively, Annapurna) filed a lawsuit against Gilberg and Plymouth. Annapurna has been the tenant of Unit G-02 since 2008 and has used the space to run its restaurant, Chicago Curry House. Annapurna asserts several claims against Plymouth, including claims for private nuisance, trespass, and negligence. *See* Pls.' Ex. G (Annapurna Am. Compl.). Annapurna asserts that it had to close the restaurant on several occasions over a six-year period due to water damage from the building's swimming pool. Annapurna alleges that "water leaks were a condition that was known to [Plymouth and Gilberg] since at least 2009, and which continued to occur between 2010 and 2014 because of the neglect of [Plymouth], and its ongoing negligently shoddy maintenance of the condominium pool and its associated mechanical structures." *Id.* Ct. 5, ¶ 24. Annapurna claims that it "lost in excess of $500,000 in the combined costs of lost business income, and paid repair costs, property damage and inventory loss." *Id.* Ct. 1, ¶ 14.

For the last two years, Admiral has been defending Plymouth in both the Gilberg and Annapurna lawsuits under a reservation of rights. Compl. ¶ 43. Admiral now contends, however, that the claims in the underlying lawsuits are not covered by Plymouth's insurance policy. Admiral has filed a five-count complaint. In count 1, Admiral contends that Plymouth is not entitled to coverage under the insurance policy's property damage provision because the underlying lawsuits do not allege property damage caused by an "occurrence" within the meaning of the policy. In count 2, Admiral contends that the underlying lawsuits are excluded from coverage because the

6

damage was expected or intended from Plymouth's standpoint. In count 3, Admiral asserts that even if the property damage identified in the underlying lawsuits was caused by an "occurrence," Plymouth is not entitled to indemnification under various policy exclusions. In count 4, Admiral alleges that there is no coverage under the insurance policy's personal / advertising injury provision because the water leaks described by Annapurna do not constitute a "wrongful entry or invasion" within the meaning of the policy. Admiral further alleges that, to the extent that Annapurna does allege a wrongful entry, for coverage purposes the policy requires the wrongful entry to be committed "by the owner, landlord or lessor of the unit," which is Gilberg, not Plymouth. *Id.* ¶ 74. And in count 5, Admiral alleges that Plymouth is not entitled to coverage under any provision of the insurance policy based on the known loss doctrine, because Plymouth "knew or had reason to know" that Unit G-02 was undergoing damage from leaks prior to the inception of its insurance policy. *Id.* ¶ 84.

Plymouth contends that Admiral owes it a duty to defend and indemnity; it has moved for summary judgment on all of its claims on the issue of duty to defend. Admiral has filed a cross-motion for summary judgment on counts 1, 2, and 4, and it asks the Court to deny Plymouth's motion for summary judgment on counts 3 and 5, arguing that any decision while the underlying litigation is still pending would be inappropriately premature.

**Discussion**

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

7

R. Civ. P. 56(c)(2); *see also Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). On cross-motions for summary judgment, the court considers each motion separately and construes "all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002).

The construction of an insurance policy is a question of law that can be appropriately decided via summary judgment. *Stoneridge Dev. Co. v. Essex Ins. Co.*, 382 Ill. App. 3d 731, 748-49, 888 N.E.2d 633, 650 (2008). An insurance policy "is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Id.* at 749. If the language of the policy is clear and unambiguous, it must be given its plain, ordinary, and popular meaning. *Rich v. Principal Life Ins. Co.*, 226 Ill. 2d 359, 371, 875 N.E.2d 1082, 1090 (2007). If, however, the words used in the policy are susceptible to more than one reasonable interpretation, the ambiguity must be resolved in favor of coverage. *Id.*

A court determines whether an insurer has a duty to defend by examining the underlying complaint and the language of the insurance policy. *Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155, 828 N.E.2d 1092, 1098 (2005*)*. If the underlying complaint "alleges facts within or potentially within the policy's coverage, the insurer's duty to defend arises even if the allegations are groundless, false or fraudulent." *United Nat'l Ins. Co. v. 200 N. Dearborn P'ship*, 2012 IL App (1st) 100569, ¶ 17, 979 N.E.2d 920, 925. And if the "duty to defend is found to exist with respect to one or some of the theories of recovery advanced in the underlying litigation,

8

the insurer must defend the insured with regard to the remaining theories of recovery as well." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Glenview Park Dist.*, 158 Ill. 2d 116, 124, 632 N.E.2d 1039, 1042-43 (1994).

A.  **Coverage for "occurrence" under property damage insurance**

First, Plymouth argues that the plain language of Coverage A, the policy's bodily injury / property damage provision, entitles it to coverage. The policy provides coverage for an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Plymouth Policy § 5, ¶ 13.

Admiral says that what is at issue in the underlying case does not involve an "accident." Illinois courts have defined "accident" to mean "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." *Stoneridge Dev. Co*, 382 Ill. App. 3d at 749, 888 N.E.2d at 650. Admiral argues that the damage in question was foreseeable; it relies in part on allegations in the underlying complaints that Plymouth was aware of the damage from the pool leaks but did not take proper actions to prevent future leaks.

The insurance policy in this case, however, expressly defines "accident" to include "continuous or repeated exposure" to the same harmful conditions. The plaintiffs in the underlying lawsuits allege exactly this; they say that there was repeated leakage of water from the pool that caused damage to the restaurant. As Plymouth argues, "[i]f continuous leaks could never be covered, it would render the provision allowing for continuous or repeated exposure superfluous." Defs.' Mem. in Supp. for Summ. J. at 8. Based on the plain language of Coverage A in Plymouth's policy, the

9

damage alleged in the underlying lawsuits meets the policy's definition of an occurrence.

Even if the common law definition of "accident" were controlling, Plymouth would be entitled to a defense in the underlying lawsuits. Admiral argues that the facts as alleged in those lawsuits reflect a conscious failure by Plymouth to make necessary repairs to the pool despite being on notice of leaks and that, as a result, the damage was not an unforeseen occurrence. *See generally Cambridge Mut. Fire Ins. Co. v. 1347-49 N. Sedgwick Condo. Ass'n*, No. 12 C 878, 2013 WL 271222, at *4 (N.D. Ill. Jan. 23, 2013). But the suits also include allegations consistent with the view that Plymouth did not ignore the problem but rather attempted to fix it, albeit unsuccessfully. Because the law requires construing the underlying claims in favor of coverage, *see Ins. Co. of Hanover v. Shelborne Assocs.*, 389 Ill. App. 3d 795, 799, 905 N.E.2d 976, 981 (2009), these allegations are sufficient to require Admiral to continue to defend the suits.

Under established Illinois insurance law, "economic losses sustained as a result of defects in or damage to the insured's own work or product are not covered by a comprehensive general liability insurance policy." *Ohio Cas. Ins. Co. v. Bazzi Const. Co.*, 815 F.2d 1146, 1148 (7th Cir. 1987). The reason is that such policies "'are intended to protect the insured from liability for injury or damage to the property of others,'" not the cost of repairing or replacing the insured's defective work. *Id.* (quoting *Qualls v. Country Mut. Ins. Co.*, 123 Ill. App. 3d 831, 833-34, 462 N.E.2d 1288, 1291 (1984)). But "damage to something other than the project itself *does* constitute an 'occurrence' under a CGL policy." *Milwaukee Mut. Ins. Co. v. J.P. Larsen, Inc.*, 2011 IL App (1st) 101316, 956 N.E.2d 524, ¶ 27 (emphasis in original). This is the situation

here.  Gilberg and Annapurna allege that Plymouth's faulty repairs caused damage to Unit G-02.  Specifically, Annapurna alleges that its lost profits were the result of Plymouth's "ongoing negligently shoddy maintenance of the condominium pool and its associated mechanical structures."  Annapurna Am. Compl., Ct. 6, ¶¶ 24, 29.  Similarly, Gilberg alleges that Plymouth attempted to repair the pool leaks in October 2013 and June 2014, intending to prevent future leaks, but that due to the "purported 'remedies' that [Plymouth] performed and/or caused to be performed" to the pool, the retail and rental value of Unit G-02 decreased, making the unit "substantially unmarketable."  Gilberg Fourth Am. Compl. ¶¶ 40, 54, 55, 60, 62.  Even if some water damage occurred before the allegedly faulty repairs, this would not alter Admiral's duty to defend.  When there is a duty to defend under only one of the theories of recovery advanced in the underlying suits, Admiral "must defend the insured with regard to the remaining theories of recovery as well."  *Glenview Park*, 158 Ill. 2d at 123-24, 632 N.E.2d at 1042-43.

**B.    Exclusion for expected or intended damage**

Admiral next asserts that Plymouth is not entitled to coverage because its policy excludes coverage for bodily injury or property damage that is "expected or intended from the standpoint of the insured," Plymouth Policy § 1, ¶ 2(a), and the damage to Unit G-02 was expected from Plymouth's standpoint.  Gilberg alleges in her complaint that she notified Plymouth of the leaks on a "regular basis between July 2012 and May 2013," and Annapurna alleges in its complaint that "water leaks were a condition that was known to [Plymouth] since at least 2009."  Gilberg Fourth Am. Compl. ¶ 31; Annapurna Am. Compl. Ct. 4, ¶ 24.

Those allegations are certainly there, but as discussed in the previous section,

11

both Gilberg and Annapurna make allegations of and consistent with negligence on the part of Plymouth. "If the underlying complaints allege facts within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent." *Northbrook Prop. & Cas. Co. v. Transp. Joint Agreement*, 194 Ill. 2d 96, 98, 741 N.E.2d 253, 254 (2000). A duty to defend exists "unless it is clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage," *id.*, which is not the case here.

Once the insured meets its burden of showing coverage applies, as Plymouth has, the insurer bears the burden of proving that an exclusion applies. *See, e.g., Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010). Admiral has not met this burden. Though Gilberg and Annapurna make allegations of knowing conduct by Plymouth, they also allege negligence. "While the allegation of intentional [conduct] would remain outside the coverage, the duty to defend is not extinguished when negligence is also alleged." *Skolnik v. Allied Prop. & Cas. Ins. Co.*, 2015 IL App (1st) 142438, ¶ 29, 45 N.E.3d 1161, 1167. And Admiral presents no evidence to suggest that Gilberg and Annapurna's asserted claims are baseless. *See, e.g., Allstate Ins. Co. v. Carioto,* 194 Ill. App. 3d 767, 775, 551 N.E.2d 382, 386 (1990) (finding allegations of negligence "facetious" where the underlying conduct was plainly willful).

**C. Coverage under personal and advertising injury endorsement**

Plymouth argues that even if the bodily injury / property damage coverage does not apply, the policy's coverage for damages because of "personal and advertising

12

injury" (Coverage B) applies. Plymouth Policy § B, ¶ 1(a). Personal and advertising injury "means injury, including consequential 'bodily injury,' arising out of one or more of the following offenses . . . . (c) The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." *Id.* § 5, ¶ 14(c). Plymouth argues that the underlying suits both allege what amounts to an "invasion" of water or "wrongful entry" affecting the restaurant.

Admiral contends that this coverage does not apply for two reasons. First, it argues that the underlying complaints do not allege an injury within the meaning of this provision of the policy and thus and do not trigger a duty to defend. Second, Admiral argues that even if the underlying complaints do allege a covered injury, the coverage does not apply because the policy requires the entry or invasion to be "committed by or on behalf of [the unit's] owner, landlord or lessor," namely, Gilberg. Plymouth contends that the claims of nuisance and trespass in the underlying complaints satisfy the policy's injury requirement. It also argues (among other things) that the policy language is ambiguous and reasonably can be interpreted in favor of coverage and alternatively that it has a sufficient ownership interest for the coverage to apply.

The complaints allege injuries that fit the definition in Coverage B. Claims based on allegations of private nuisance and trespass entail a "wrongful entry or eviction or other invasion of the right of private occupancy." *Great Am. Ins. Co. of N.Y. v. Helwig*, 419 F. Supp. 2d 1017, 1025 (N.D. Ill. 2006) (citing *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1041 (7th Cir. 1992); *Scottish Guar. Ins. Co. v. Dwyer*, 19 F.3d 307, 312 (7th Cir. 1994); *Illinois Tool Works Inc. v. Home Indem. Co.*,

13

998 F. Supp. 868, 872 (N.D. Ill. 1998); *Millers Mut. Ins. Ass'n of Illinois v. Graham Oil Co.*, 282 Ill. App. 3d 129, 140, 668 N.E.2d 223, 231*(*1996)). The underlying complaints here include claims of this sort. Gilberg Fourth Am. Compl. ¶ 79; Annapurna Am. Compl. Ct. 4, ¶ 13.

On the second question, Admiral argues that the policy language requiring "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, *committed by or on behalf of its owner, landlord or lessor*," Plymouth Policy § 5, ¶ 14(c) (emphasis added), requires the wrongful entry or invasion to be committed by the owner, landlord, or lessor. Admiral argues the coverage does not apply because Plymouth does not own the unit—Gilberg is the owner.

The Court rejects Plymouth's argument that the policy term is ambiguous. It relies on cases that considered a similar provision with different language. In both *Lexington Ins. Co. v. Bernard Parish Gov't*, 548 F. App'x 176, 179 (5th Cir. 2013), and *Lakeland Vill. Homeowners Ass'n v. Great Am. Ins. Grp.*, 727 F. Supp. 2d 887, 893 (E.D. Cal. 2010), the policy language covered injuries arising from "invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor." The courts in those cases said that the phrase did not necessarily require the *invasion* to be committed by the owner; rather it required the injured person to be *occupying the premises* on behalf of the owner. The ambiguity required reading the policy language in the insured's favor. The policy issued by Admiral does not contain this ambiguity. Language that requires "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room,

14

dwelling or premises that a person occupies, *committed by* or on behalf of its owner, landlord or lessor" quite plainly requires the invasion to be committed by the owner.

Unless Plymouth may be considered an "owner, landlord or lessor" of the "room, dwelling or premises" where the invasion has occurred, Coverage B does not apply. Plymouth argues that it has an interest in the walls, floors, and ceiling surrounding the unit. But Plymouth cites no authority that this is sufficient to trigger coverage, and the argument is contrary to the policy's language. The "room, dwelling, or premises" that the restaurant occupies is, quite obviously, the unit itself, not the area surrounding it. The Court concludes that Coverage B does not apply.

**D.     Duty to indemnify**

In count 3 of the complaint, Admiral alleges that: (1) any indemnity obligation for the underlying lawsuits under Coverage A is limited to property damage that took place during the policy periods; (2) any indemnity for damage to the pool and common elements is excluded from coverage under Exclusions j.(1), j.(4), j.(5) and/or j.(6); and (3) Admiral has no obligation to indemnify for any "property damage" to the pool/common elements. Pls.' Resp. and Mem. in Supp. of Mot. for Summ. J. at 16. Although Plymouth initially moved for summary judgment on count 3, Plymouth effectively withdrew its motion in its combined reply/response brief, stating that "the parties appear to be in agreement that any declaration regarding the duty to indemnify is premature." Defs.' Reply and Resp. at 10. The Court agrees and therefore will not address this claim.

**E.     Known loss doctrine**

Plymouth seeks summary judgment on Admiral's defense to coverage based on

the known loss doctrine. A known loss occurs when "the insured knows or has reason to know, when it purchases a policy, that there is a substantial probability that it will suffer or has already suffered a loss." *Grey Direct, Inc. v. Erie Ins. Exch.*, 460 F.3d 895, 899 (7th Cir. 2006) (internal quotation marks omitted). An insurer has "no duty to defend or indemnify the insured with respect to [a] known loss . . . unless the parties intended the known loss to be covered." *Sagar Megh Corp. v. United Nat'l Ins. Co.*, 999 F. Supp. 2d 1018, 1025 (N.D. Ill. 2013) (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 104, 607 N.E.2d 1204, 1210 (1992)). Plymouth argues that Admiral cannot show that Plymouth was aware of the water damage to Unit G-02 before it purchased the policy for the periods of November 1, 2010 to November 1, 2013. Admiral argues that no factual determination can be made at present.

The Court agrees with Admiral. The Court is unable to determine, and cannot appropriately determine at this juncture, when Plymouth first became aware of the water leaks causing damage to Unit G-02. The Gilberg complaint alleges that in 2012, "structural problems in the Pool and/or the lining of the Pool caused leaks to occur." Gilberg Fourth Am. Compl. ¶ 26. Plymouth reads this allegation to mean that the leaks began in 2012 and thus that the damage from the leaks occurred after it first purchased insurance from Admiral. Annapurna's complaint, on the other hand, alleges that "[p]rior to May 2008, [Plymouth and Gilberg] knew that the condominium pool leaked into Unit G-02 and into the adjacent units . . . ." Annapurna Am. Compl. Ct. 1, ¶ 16. If Annapurna is right, then Admiral may be correct that the known loss doctrine applies. But "[i]n a declaratory-judgment action, the court may not determine an insured's actual liability nor determine any facts that may form the basis of an insured's liability."

16

*Skolnik*, 2015 IL App (1st) 142438, ¶ 49, 45 N.E.3d at 1172.  Thus the Court cannot determine the applicability of the known loss doctrine at this time.

## Conclusion

For the aforementioned reasons, the Court grants summary judgment in favor of plaintiff on count 4 of its complaint but otherwise denies plaintiffs' motion for summary judgment [dkt. no. 29] and grants summary judgment in favor of defendant on counts 1 and 2 of plaintiff's complaint with regard to the issue of duty to defend but otherwise denies defendants' motion for summary judgment [dkt. no. 17].  The case is set for a status hearing on February 8, 2017 at 9:00 a.m., in chambers (Room 2188), to set a schedule for discovery and pretrial proceedings.  The parties are directed to confer in advance of the hearing to attempt to agree on a schedule to propose to the Court.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 24, 2017